IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

2

3  UNITED STATES OF AMERICA      )   CASE NO. 1:13CR435-1
                                 )
4           vs.                  )
                                 )   Winston-Salem, North Carolina
5  BRIAN DAVID HILL              )   June 30, 2015
   _____    2:47 p.m.

6

7

8      TRANSCRIPT OF THE **SUPERVISED RELEASE VIOLATION HEARING**
            BEFORE THE HONORABLE THOMAS D. SCHROEDER
9                 UNITED STATES DISTRICT JUDGE

10

11  APPEARANCES:

12  For the Government:        ANAND RAMASWAMY, AUSA
                               Office of the U.S. Attorney
13                             101 S. Edgeworth Street, 4th Floor
                               Greensboro, North Carolina 27401

14

15  For the Defendant:         RENORDA E. PRYOR, ESQUIRE
                               Herring Law Center, PLLC
16                             16 W. Martin Street, Suite 307
                               Raleigh, North Carolina 27601

17

18  Court Reporter:            BRIANA NESBIT, RPR
                               Official Court Reporter
19                             P.O. Box 20991
                               Winston-Salem, North Carolina 27120

20

21

22

23

24
        Proceedings recorded by mechanical stenotype reporter.
25     Transcript produced by computer-aided transcription.

1                           INDEX

2

3  **GOVERNMENT'S WITNESSES:**                        **PAGE:**

4

5  FEDERAL PROBATION OFFICER KRISTY BURTON:

6      Direct Examination by MR. Ramaswamy          4
       Cross-Examination by Ms. Pryor               15
7      Redirect Examination by Mr. Ramaswamy        34
       Recross-Examination by Ms. Pryor             37

8

9  **DEFENDANT'S WITNESSES:**                         **PAGE:**

10

11 ROBERTA HILL:

12     Direct Examination by Ms. Pryor              40
       Cross-Examination by Mr. Ramaswamy           46
13

14 KENNETH  FORINASH:

15     Direct Examination by Ms. Pryor              51

16

17

18

19

20

21

22

23

24

25

        USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

P R O C E E D I N G S

(The Defendant was present.)

**MR. RAMASWAMY:**  May the Government call the next matter?

**THE COURT:**  Yes.

**MR. RAMASWAMY:**  The Government would call United States versus Brian David Hill in 1:13CR435-1.  He is represented by Ms. Pryor.  The matter is here for hearing on a supervised release violation.

**THE COURT:**  All right.  This time, I think, Mr. Cameron and Ms. Burton are here on this matter.

Ms. Pryor, good afternoon to you.

**MS. PRYOR:**  Good afternoon, Your Honor.

**THE COURT:**  And, Mr. Hill, good afternoon to you.

We are here today for a hearing on a request to revoke supervised release.  Did you receive a copy of the petition in this case, Ms. Pryor?

**MS. PRYOR:**  I did, Your Honor.

**THE COURT:**  Did you review that with your client?

**MS. PRYOR:**  I have reviewed it, Your Honor.

**THE COURT:**  Are you prepared for a proceeding today?

**MS. PRYOR:**  We are prepared, Your Honor.

**THE COURT:**  Mr. Hill, did you receive a copy of the petition in your case, sir?

**THE DEFENDANT:**  Yes, sir.

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1          **THE COURT:**  And did you review that with your

2    attorney?

3          **THE DEFENDANT:**  Yes, sir.

4          **THE COURT:**  Do you understand the allegations in the

5    petition?

6          **THE DEFENDANT:**  Yes, sir.

7          **THE COURT:**  All right.  Thank you.  You may have a

8    seat.

9          We are here today because the petition alleges that

10   on April 28, 2015, Mr. Hill was verbally abusive toward

11   Probation Officer Kristy Burton and failed to follow her

12   instructions; and it's amended by Judge Osteen to indicate that

13   as part of this proceeding, the Court would inquire about

14   Mr. Hill's possible access to an online computer service, which

15   would constitute a violation of the terms of his supervised

16   release, unless previously approved by the probation officer.

17          Does the Defendant admit or deny these allegations?

18          **MS. PRYOR:**  Your Honor, he denies.

19          **THE COURT:**  All right.

20          **MR. RAMASWAMY:**  The Government would call Kristy

21   Burton.

22   **FEDERAL PROBATION OFFICER KRISTY BURTON,** GOVERNMENT'S WITNESS,

23   at 2:49 p.m., being first duly sworn, testified as follows:

24                     DIRECT EXAMINATION

25

1  **BY MR. RAMASWAMY**

2  Q    Would you state your name and occupation, please.

3  A    Kristy Burton.  I'm a United States probation officer.

4  Q    Are you the supervising probation officer for Mr. Hill?

5  A    I am, yes, sir.

6  Q    When did he come under your supervision?

7  A    November 14th I believe is the date.

8  Q    And did you cause to be issued this petition for a warrant

9  for the violations listed therein?

10 A    I was, yes, sir.

11 Q    I want to ask you first about the living arrangements for

12 Mr. Hill.  Can you describe those for the Court, please?

13 A    I can.  He lives with -- he has his own apartment in the

14 basement area.  The home is his -- belongs to his grandparents,

15 and it is broken up into four apartments.  The grandparents

16 live on the main level, his mother lives in a separate

17 apartment, I believe one is empty, and Mr. Hill lives on the

18 bottom.

19 Q    And you've described these as apartments.  Is this

20 otherwise what would be a single-family residence structure?

21 A    It is, yes, but it has been legally broken up.  They each

22 have their own numbers.

23 Q    Are there conditions restricting computer use, telephone

24 use, other device use by Mr. Hill?

25 A    There is restrictions in regards to using anything that

1  has access to online services.

2  Q    Can you -- is Mr. Hill prohibited from being on a

3  computer?

4  A    No, he is not.

5  Q    Do you know if he possesses a computer?

6  A    He does, yes.

7  Q    And did he also possess a cell phone during the period of

8  his supervision?

9  A    I don't know if he possessed it as far as it was in his

10  name.  I believe -- my understanding of it was it was his

11  grandmother's, and she let him use it, but he did have it on

12  him occasionally.

13  Q    I want to get back to that in a moment; but in relation to

14  the living arrangements, were there three or four apartments

15  within the house?

16  A    I believe there are four apartments, but only three of

17  them are occupied.

18  Q    Is there -- have there been any difficulties with you

19  supervising Mr. Hill that relate to the apartment division or

20  the living arrangements?

21  A    There are in regards to computer access.  Other family

22  members in the home have computers; and in regards to being

23  able to search those, I can't legally do it because they are

24  not in his possession or in his apartment.  So I have some

25  concerns that he has access to those, and I can't do anything

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1  about that.

2  Q    To your knowledge, do any of the other computers have

3  Internet access?

4  A    I believe his mother's does, but I can't inform anymore of

5  the grandparents.  I haven't been able to walk through the

6  entire dwelling to see.

7  Q    Going back to that phone you mentioned, did you say it was

8  a TracFone?

9  A    Yes, it was.  I believe it's a prepaid phone.

10 Q    And would you tell the Court about how you came to be

11 aware of Mr. Hill using that particular phone?

12 A    Well, originally, he told me he was texting, but I was not

13 aware that there were any documents being sent via text.  I

14 knew that there were documents being sent via fax, but I did

15 not know of any other documentation.  So I did know that he was

16 texting originally, and I didn't have any issues with that.  He

17 had received -- he told me he had received some text messages

18 which contained child pornography, and he willingly gave me one

19 of the phones; and I still have that in evidence lockup in our

20 office, and I believe the minutes were transferred to another

21 phone that he continued to text from.  So I was aware that he

22 had the phone, but he always said that it was his

23 grandmother's, and she let him use it for legal purposes

24 generally.

25 Q    Did anything happen in relation to that phone and the

1   courts?

2   A    I became aware that multimedia messaging was occurring,

3   that documents were being sent to the clerk's office and being

4   filed through ECF that way.  So, yes, that's what had occurred.

5   Q    Do you know if anything -- in regards to the clerk's

6   office, was anything sent?

7   A    There had been emails sent to the courts, but I cannot

8   verify that it was from that phone.

9   Q    Do you know whether or not those emails were from

10  Mr. Hill?

11  A    I cannot -- they were all sent from a Tor account.  So I

12  think he has sent some emails to the Court, but they were only

13  in regards to documents.  Otherwise, I can't confirm that they

14  were sent from his phone.

15  Q    You mentioned a Tor account.  Do you know what Tor is?

16  A    I am vaguely aware of what Tor is.  It's an anonymous

17  email account server.

18  Q    Have you seen the emails that were sent from a Tor address

19  to the Court?

20  A    I have, yes.  I don't know if I have seen all of them, but

21  I have seen some of them, yes.

22  Q    Have you had an opportunity -- do you have any of those?

23  A    I may.  I may not have actual copies of them now, but I do

24  have them in my notes, or at least a set of them in my notes.

25  Q    Well, let me stop you there.  Let's go back to the

1  TracFone.  You stated you were aware and had no issue with

2  Mr. Hill texting; correct?

3  A    Correct.

4  Q    And you were aware of him receiving messages?

5  A    I mean, I just assumed he was receiving messages.  We

6  never spoke about it.

7  Q    Did you know that anything was being sent to the ECF

8  filing system through a TracFone?

9  A    I was made aware of that, yes, by the clerk and the U.S.

10 Marshal Mr. Moore that documents were being filed from the

11 TracFone.

12 Q    Had Mr. Hill made you aware of that before?

13 A    No.  I wasn't aware that he was sending them that way, no.

14 Q    Did you ever ask him about that?

15 A    I did.  I addressed it on the April 28th visit.  That was

16 part of what we were discussing.

17 Q    Would you describe the April 28th visit, please, for the

18 Court?

19 A    I arrived at the home, and he was not in his apartment.

20 He was actually upstairs at his grandparents.  So I knocked on

21 that door.  His grandfather answered the phone [sic] and got

22 Mr. Hill, and I believe he went and got the mother, I was later

23 informed; but everybody was in the room.  It was me and him,

24 his grandparents, and his mother.

25      I stood by the door and was talking to Mr. Hill originally

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1  about the text messaging.  I brought -- I said there were some

2  issues that we need to discuss, and we spoke about the document

3  texting to the Court, and I had been informed by the Court --

4  or the clerk's office that they had told him to stop, but he

5  had not stopped at that point.  So I was directing him to cease

6  that behavior.  He indicated -- he got very upset and indicated

7  that he had already stopped that behavior.  He received a

8  letter from the clerk's office, and he was no longer doing that

9  and started pacing and hit a couple of things off the nearby

10 tables onto the ground.

11      And at that point, I said, you know, I will leave, and we

12 can meet at the probation office to finish the discussion; and

13 he said, no, I will be okay, I'm okay, or something to that

14 effect, and I was, like, all right.  I let him take a second

15 and he stopped, and we continued the discussion about the

16 documents and sending multimedia messaging.  He was upset

17 again.  And we addressed in that conversation as well his need

18 to go to an appointment with a psychiatrist through Piedmont

19 Community Services, which he had canceled, and he told me that

20 he didn't need that.

21 Q    I want to ask you about that appointment.  Is that

22 something you helped arrange?

23 A    It was, yes.  I spoke with his caseworker, Ms. Patterson,

24 in Piedmont, and we both agreed that it would be beneficial for

25 him to go meet with a psychiatrist for possible medications.

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1  Q    To your knowledge, on April 28th of this year when you

2  made the visit, was he on any medication?

3  A    Besides for his other medical issues, no, he was on no --

4  none, no medications.

5  Q    Now, the medical issues, do you mean the diabetes?

6  A    Yes.

7  Q    The counseling that was set up, was that something that

8  was in his judgment, that he's to follow mental health

9  treatment?

10  A    It is listed in his conditions, yes, and then specifies

11  sex offender treatment as well.

12  Q    Now, did he follow through with those appointments?

13  A    Which appointments?

14  Q    Any of them?

15  A    He did follow through with his sex offender treatment

16  appointments.  He had gone to all of those as directed, and he

17  had missed a couple of Piedmont appointments, which was what we

18  were talking about.  It may have just been one, and he canceled

19  the psychiatrist appointment, and so we were just there to

20  address that he needed to redo those to make sure that he was

21  going.

22  Q    Did you ask him why he canceled his appointment?

23  A    It didn't come up in that conversation.  He got very

24  agitated, continued to hit things and started calling me names

25  and tried to leave the room, and I directed him to come back

1   and have a seat, which he complied with, but he continued to

2   call me names and hit things.  So I left.  So there was no

3   opportunity really to continue the conversation.

4   Q    When you say he was hitting things or hitting things off

5   the table, what kind of things?

6   A    I mean, one was a telephone he hit off the table beside

7   him.  There were some decorative items, I believe plates and

8   glass stuff, he would just hit onto the floor.

9   Q    Was he breaking things?

10  A    Nothing was broken, no, not that I am aware of.

11  Q    How close to you is that table, please?

12  A    I mean, we were all in the living room.  So my estimate

13  would be he was probably 8 or 10 feet away from me.

14  Q    Did he raise his voice?

15  A    Yes.  I mean, he was agitated.  His volume got louder.

16  Q    There are descriptions in the petition of what you

17  described as cussing.  What exactly did he call you?

18  A    He called me a jerk.  He told me, "You know what?  You are

19  a jerk."  When he sat down, he called me an asshole twice.

20  Q    In response to all of those actions, what did you do?

21  A    Well, after he called me an asshole the second time, I

22  left the residence.

23  Q    Why?

24  A    I felt unsafe.  I mean, his behavior was continuing to

25  escalate even though he sat down, and we weren't getting

1 | anywhere besides name calling.  So I didn't feel like there was
2 | any need to be there any longer and to agitate the situation
3 | any further.
4 | Q    Who else was in the room when this was going on?
5 | A    His grandparents and his mother were all in the room.
6 | Q    Did it appear anyone else was trying to deescalate the
7 | situation?
8 | A    At one point I believe they all were trying to say
9 | something to him to the degree of calm down.  You know, she's
10 | just doing her job.  You just need to calm down.
11 | Q    Did that seem to have any effect on Mr. Hill?
12 | A    I mean, he would -- there were -- on two occasions, he
13 | said he would be okay, the first one being when I said I was
14 | about to leave and he could meet me at the probation office,
15 | and I think I had said that another time, and he said, no, he
16 | would be okay; but, I mean, it never went away.
17 | Q    One moment.  In addition to what you alleged in the
18 | petition, there is a handwritten condition about inquiring as
19 | to the online activity or online devices.  To your knowledge --
20 | what's your knowledge of any online activity or devices that
21 | might access the Internet that Mr. Hill may have used?
22 | A    It's purely speculation.  There are -- have been several
23 | articles that have been written online under a different name.
24 | I believe the name is a Sheila Dogwood, and I don't know who
25 | this individual is, but it's always in reference to Mr. Hill's

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1  case, as far as I can tell.  They never say anything more.

2  There have been several emails sent from a Tor account.  I'm

3  speculative that he is doing some of that, given that I believe

4  since he's been locked up, there have been no other activity on

5  that front at all from my last visit, but I can't prove any of

6  that.

7  Q    Do any of those either online postings -- do any of those

8  online postings you mentioned -- are they the same as the ECF

9  filings you have seen from Mr. Hill to the Court?

10 A    It is all in regards to the same documents and the same

11 subject matters, so, yes.

12 Q    Are you saying you have no personal knowledge that he's

13 doing that?

14 A    I do not, no.

15 Q    Does the content of any of those show what could be

16 described as intimate knowledge of Mr. Hill's situation?

17 A    Yes, sir.  I mean, it's the same information of him being

18 set up.  It's the same type of information that he faxes to me

19 or the Court or files within the system.  It's the same

20 language every time.

21 Q    Have you done anything with the TracFone that was

22 seized -- or did you seize the TracFone from Mr. Hill?

23 A    I seized the first TracFone, yes.  Nothing has been done

24 with it yet.  At this moment, we don't have the capability to

25 search that type of phone, and I have not found a law

1  enforcement agency that will search it for me.  So as to

2  obtaining any evidence or anything, any information that

3  Mr. Hill has provided for me, I have not done anything with it.

4  Q    You said the first phone.  Is that the one that Mr. Hill

5  told you contained the child pornography?

6  A    Correct, yes.  I never looked at the phone -- I mean, I

7  looked at it in his presence that day to turn it off, but I

8  have not touched it since.  It's been in our evidence.

9  Q    Did he say how he knew it contained child pornography?

10 A    He accidentally opened the document, which I believe was

11 also sent from an anonymous account, and he saw that it

12 contained child pornography.

13 Q    So is it your statement that nothing has been done with

14 that phone?

15 A    Not at this point, no.

16 Q    And there's been a second phone that he's been using?

17 A    I believe his -- they got another phone and transferred

18 the minutes, but I have not had any access to that phone.

19            **MR. RAMASWAMY:**  I have no other questions.

20            **THE COURT:**  Ms. Pryor, any cross?

21            **MS. PRYOR:**  Yes, Your Honor.

22                      CROSS-EXAMINATION

23 **BY MS. PRYOR**

24 Q    Officer Burton, before you visited Mr. Hill, did you know

25 about his mental health conditions?

1  A    Yes, ma'am.

2  Q    Okay.  Did you know that he had already took a

3  psychological test for the federal custody -- while in federal

4  custody?

5  A    Yes.

6  Q    And you are aware of all the results that were revealed,

7  and those results were revealed in his PSR; is that correct?

8  A    Yes, ma'am.

9  Q    You are aware that he suffers from autism?

10 A    I am, yes, ma'am.

11 Q    And you are aware that, you know, based on what the

12 psychology [sic] reported, that he has a difficulty of

13 understanding other people in social interactions?

14 A    The report indicates that people who suffer from autism

15 can exhibit those, yes, ma'am, I do.

16 Q    And do you believe that that report was written based on

17 the psychological -- psychologist's evaluation of Mr. Hill?

18 A    It was, yes, ma'am.

19 Q    And do you believe that that report was true or believe

20 that that report came out of her or his -- I believe it was a

21 her who actually did the testing.  Do you believe that she'd

22 done that based on her experience and knowledge in the

23 community?

24 A    I'm sure, yes.

25 Q    Okay.  And based on your reading of the PSR, did you

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1  notice that it also stated that any time that there is an

2  emotionally overwhelming situation or when Mr. Hill has felt --

3  feel any threat -- threatened or anything like that, that he

4  does tend to have some aggressive behavior and not only him,

5  but others in his type of -- that has the type of autism that

6  he has also also has those type of things as well?

7  A    I did read that, yes.

8  Q    Are you aware that he sometimes does not have the social

9  skills necessary to respond appropriately?

10 A    I don't really understand the question.

11 Q    It's stated in the presentence report.  Would you like me

12 to walk over and --

13 A    I mean, I don't really know what you are asking.

14 Q    I am asking did you remember reading that, that he does

15 not have the social skills necessary to respond appropriately?

16 A    I don't remember reading that exact phrase, no.

17         **MS. PRYOR:**  Your Honor, may I approach the witness,

18 Your Honor?  Your Honor, it's in the PSR.

19         **THE COURT:**  If it's in the PSR, it's in the PSR.

20         **MS. PRYOR:**  All right.  Thank you, Your Honor.

21 **BY MS. PRYOR**

22 Q    Also, are you aware that Mr. Hill suffers from

23 Obsessive-Compulsive Disorder?

24 A    I had read that, yes, ma'am.

25 Q    Okay.  And are you aware that his sending documents to the

1  Court on his behalf is a way of dealing with this disorder?

2  A    It had indicated that that is a possibility, yes, ma'am.

3  Q    Are you aware that when he does send documents to the

4  Court, that it reduces his anxiety?

5  A    I believe the statement was that it may temporarily reduce

6  it, yes.

7  Q    And you did also probably note in the PSR that he has high

8  levels of anxiety, and those things can only be corrected

9  through generalized -- through his Generalized Anxiety

10 Disorder?

11 A    I did read about that, yes.

12 Q    Okay.  And out of all -- reading all of those things, what

13 were your -- what things did you do, or what type of actions or

14 recourse or research did you do before you went to go speak to

15 Mr. Hill on April 28th?

16 A    Prior to that specific date?

17 Q    Yes, ma'am.

18 A    I mean, I had read his presentence report, and based on my

19 interactions with him, up until that point, I didn't do

20 anything specific to prepare for that exact meeting.

21 Q    Okay.  But you know on that exact meeting that you would

22 be telling him that he could not do something or you knew that

23 there was going to be some type of maybe misunderstanding of

24 that -- in that particular, I guess, situation?

25 A    Yes, but I would describe that as most of our meetings

1 | were like that.
2 | Q    Okay.  Can you go back to maybe the first meeting?  Was
3 | your first meeting that you met with Mr. Hill -- was it about
4 | what he could -- that someone had directed and told him he
5 | could not do something that he had been doing that helped him
6 | within -- with his anxiety?
7 | A    I don't know that that was a discussion at our very first
8 | meeting.
9 | Q    Okay.
10 | A    I initially met with him and then met with him the very
11 | next day with his conditions because I did not have those at
12 | that point.
13 | Q    Okay.
14 | A    So if what you are referring to is me talking to him about
15 | his conditions of release --
16 | Q    Yes.
17 | A    -- that was the second meeting I had with him.
18 | Q    And that second meeting when you talked about -- talked to
19 | him about his conditions of release, can you tell me where that
20 | meeting was located?
21 | A    It was at his home in his apartment actually.
22 | Q    And was his mother present?
23 | A    She was.
24 | Q    And his grandfather?
25 | A    I don't think they were present for the entire time.  They

1  came down, but I don't think they sat through the whole thing,

2  but I could be wrong on that.

3  Q    Okay.  And when you were talking to Mr. Hill regarding the

4  conditions of release, were these things that had already been

5  stated to him in court?

6  A    Yes.

7  Q    Okay.  And at that time, when you met Mr. Hill, I believe

8  this would have been your second occasion meeting with him, did

9  you -- I mean, although he stands six -- a little bit over six

10  foot, would you have stated that your initial interaction with

11  him -- that he -- his mannerism was the same of a normal

12  25-year-old?

13  A    No, ma'am.

14  Q    And knowing that, had you taken any -- had you talked to

15  anyone in your office about someone else who they might have

16  dealt with with autism?

17  A    Of course.  I've staffed this case with numerous people.

18  Q    Okay.  And what -- and just to help me understand, what

19  things did you learn about someone who deals with autism and

20  how to supervise?

21  A    Well, unfortunately, I have no reference point.  There is

22  nobody else in my office who has supervised anybody with

23  autism.  So there were no answers provided.

24  Q    There were no answers provided.  Did you ask your

25  supervisor to send you maybe to some training on that?

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1  A     No.  Training for probation officers specifically to

2  address dealing with people with autism, to my knowledge, does

3  not necessarily exist.  However, I have been to basic law

4  enforcement interaction with people who suffer from autism.

5  Q     Okay.  And can you -- well, at your training, did they

6  describe a situation of when you have to speak to an individual

7  who has autism, the aggressive behavior?

8  A     I mean, yes, they provided some examples.

9  Q     Okay.

10 A     The statement generally is if you've met one person with

11 autism, you've met one person with autism.  Unfortunately, it's

12 a diagnosis that has no black-and-white answer.  People exhibit

13 things differently and deal with things differently.  So there

14 is no one answer and no one solution to this.

15 Q     Okay.  And so knowing that, did you speak with his

16 grandparents who raised him?

17 A     I have spoken with them on occasion, but about that

18 specific incident, no, if that's your question.

19 Q     No, my question is before -- knowing -- being that you

20 were going to be supervising Mr. Hill I believe for a number of

21 years, did you talk to them about how it was going to be best

22 to communicate with Mr. Hill?

23 A     I don't think that we specifically had that conversation,

24 no.

25 Q     What about -- did you speak to his mother about that?

1   A    We discussed him prior to his release and his behavior,

2   but I can't tell you verbatim what that conversation was and

3   whether or not they gave me step-by-step tips to -- how to deal

4   with it.

5   Q    Okay.

6   A    I have since met with them since this incident, if that's

7   what you were inquiring.

8   Q    Do you believe he lives in a supportive environment

9   currently?

10  A    I believe his family is supportive, yes, but I also

11  believe that it is a very co-dependent environment.  It may not

12  be the best place for him to be considering his treatment.

13  Q    Can you explain that a little further?

14  A    Well, when I spoke with the family, the conversation is is

15  that his behaviors -- we just need to walk away and make sure

16  that he's happy and be able to deal with that, and that's not

17  really a solution.  That's just placating his behavior.  So I

18  have some concerns about that.

19       I know the family -- the grandparents travel back and

20  forth between a home in North Carolina and a home in

21  Martinsville.  So his mother is designated to take care of him,

22  and I believe she had to quit her job to do that.  She -- they

23  expressed prior to his release some issues he was having

24  before, indicated it was only a temporary setting, and that

25  changed as we went through.  They did not originally want him

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

 1  to stay in the home because of his behaviors before he was

 2  incarcerated.

 3       After further conversation, later on, at one point I

 4  showed up at the home, and, apparently, there had been an

 5  episode where Mr. Hill hit his grandfather.  There was some

 6  tense relations.  They didn't specifically explain all of it,

 7  what had happened, and his mother was going to the hospital

 8  herself to deal with some of her own issues and some issues

 9  with Mr. Hill.  That's the way it was explained to me, and I

10  just happened to show up during that time frame.

11  Q    Okay.  And while you were there in that environment, did

12  they call the police?  Was anyone hurt?

13  A    As far as I know, they never called the police, no.

14  Q    While you were there, did you feel like the environment

15  was a hostile environment?

16  A    At that moment, everybody was very agitated and flurried,

17  but I wasn't in there long enough for -- whatever had happened

18  had occurred before I got to the home.

19  Q    Did you feel like his parents were in danger -- or his

20  grandparents were in danger that day?

21  A    I mean, he was not even up there with them when I spoke

22  with them, so, no.

23  Q    So you didn't feel like there was a need to -- you didn't

24  feel like there was a need to -- that he was violent or that he

25  was putting his family in fear of their life that day?

1   A    Well, I mean, his grandfather told me he hit him.  I mean,

2   obviously, that was violent, but I told them in that meeting,

3   as I did on numerous occasions, that if they felt that they

4   were in harm, that they needed to contact the police and have

5   Mr. Hill committed.

6   Q    Okay.  Did they do that?

7   A    No, they did not.

8   Q    So did they -- would you conclude that they didn't feel

9   like they were in danger?

10  A    I would have concluded when I left that home that's what

11  they were going to do because that's what they said they were

12  going to do, that they were going to call, but it never

13  occurred.

14  Q    As a supervising officer, do you believe it's your

15  responsibility, if he's putting his family in harm or anybody

16  in the community in harm, to contact the police?

17  A    If I were witnessing him harming them, yes, it would be my

18  job to do that; but going on what they said, it is at that

19  point their responsibility.

20  Q    Do you have others on your caseload who deal with the same

21  type of mental health?

22  A    I have others on my caseload who have mental health

23  issues, whatever degree they may be.

24  Q    But anyone with autism?

25  A    I do not, no.

1  Q    You say you do not -- I'm sorry?

2  A    I do not, no.

3  Q    Okay.  I apologize.  I didn't hear you.  I apologize for

4  that.

5       And so at this point I think you told us that you haven't

6  really had any training on how to communicate with someone with

7  autism like Mr. Hill?

8  A    No, no specific training to that.

9  Q    So do you believe that you should -- so you have not

10  sought any kind of -- what about resources online?  Have you

11  sought any resources online about how to effectively

12  communicate with someone with autism like Mr. Hill?

13  A    I mean, I have done reading on autism.  I have been around

14  people who are autistic.  They are all different.  Like I said,

15  I have been to basic law enforcement training for autism.  I

16  have spoken with the training coordinator for the Commonwealth

17  Autism since our last hearing.  I have sought lots of

18  information from lots of different places.

19  Q    Okay.

20  A    There is just no one candid answer for that.  There is no

21  book that's written to deal with Mr. Hill and his issues.

22  Q    But do you believe the PSR was written to kind of give you

23  guidelines of how to deal with Mr. Hill and his condition?

24  A    I believe the PSR evaluation was written for an

25  understanding of his mental health diagnosis, yes.

1  Q    Okay.  And based on your reading of the PSR, do you

2  believe that it kind of gives you a guideline -- kind of a

3  step-by-step guideline of how to deal with him effectively in

4  communicating?

5  A    No, I don't believe it says that.

6  Q    You don't believe that?  Do you believe that it stated

7  that when -- I am just going to read it instead of walking up

8  to you.  It says that -- there is one section on page 14 that

9  says "Conclusions and Recommendations," and in it, it says that

10  that he suffers from autism -- he has Autism Spectrum Disorder,

11  and that there is difficulty -- he has difficulty understanding

12  other people in social interactions which interferes with his

13  ability to establish and maintain relationships.  "Some

14  individuals with Autism Spectrum Disorders have histories of

15  aggressive behavior, particularly in situations where they are

16  emotionally overwhelmed, feel threatened, or do not have the

17  language and social skills to respond more appropriately."

18  A    I read that statement, yes, but I don't feel that that's a

19  guideline as to how to deal with it.

20  Q    You don't?  Okay.  Would you -- well, because you don't

21  feel that way, did you take the opportunity to try to figure

22  out -- knowing that Mr. Hill would have those issues, did

23  you -- have you personally taken the steps necessary to figure

24  out how to deal with the difficult way of trying to have a

25  social interaction with him -- or a nonsocial interaction, I

1 | guess, with him?

2 | A    I guess my answer to that would be I have approached the

3 | situation knowing all of the information from the presentence

4 | report as easily as I could with as much knowledge as I could

5 | have at the time.

6 | Q    Okay.  And so let's talk about April 28th.  I believe you

7 | said you went to his home to advise him about sending documents

8 | to the Court per judge's order?

9 | A    No.  It was not per judge's order that I went to the home.

10 | I was contacted by the clerk's office and the marshals and was

11 | told that he was sending documentation electronically via MMS,

12 | multimedia messaging, and that they had directed him to stop

13 | doing that, but he had not done that.  That's what I was there

14 | to address.

15 | Q    Have you talked to anyone about multimedia messaging to

16 | determine whether it is a way of sending messages Internet

17 | base?

18 | A    I have spoken to some people about it.  I would not say

19 | that I am an expert at all, but my understanding is that it

20 | uses an Internet service to send that documentation.

21 | Q    So you are saying that text messages as well as -- I'm

22 | sorry.  Let me go back.  I apologize.  You are saying that

23 | multimedia messaging is a way to send via Internet?

24 | A    My understanding is, yes, that it uses an Internet

25 | provider to do that, that the cell phone company routes it

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1  through an Internet provider.

2  Q    Okay.  And so let me ask you.  Are you aware that Mr. --

3  the cell phone that Mr. Hill was using does not have Internet

4  service provided on that particular phone?

5  A    That's what he informed me.  It is a prepaid phone.  I

6  have not looked at the second one, but I did see the first one.

7  To my knowledge, it did not have Internet service, no.

8  Q    To your knowledge, have you spoken to his -- well, let me

9  ask.  Have you spoken to his grandmother about whether the cell

10 phone had any Internet service provider on the particular

11 phone?

12 A    They have indicated that it did not.

13 Q    But he was able to -- but you're -- but today you are

14 saying that multimedia messaging is through an Internet

15 protocol?

16 A    I am saying that my understanding of it is that the cell

17 phone company uses an Internet service, not the cell phone

18 itself.

19 Q    Okay.  And this was your first -- let me -- well, let me

20 ask.  Was this your first warning to Mr. Hill of this type of

21 behavior?

22 A    This was the first time we discussed it, yes.

23 Q    Okay.  And you issued a warrant for his arrest immediately

24 upon leaving the residence; correct?

25 A    I did.

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1  Q    Okay.  And there were no steps to give him an opportunity

2  to comply with your order or comply with what you stated?

3  A    The warrant was based on his behavior, not based on the

4  text messaging or multimedia messaging.

5  Q    Okay.

6  A    It was based on his behavior in the home.

7  Q    Okay.  And his behavior in the home, I believe you said

8  that you felt -- well, let me ask you.  You said that you asked

9  him to sit down, and he sat down?

10 A    He did.

11 Q    You asked him to stop walking around, and he stopped

12 walking around?

13 A    I asked him to sit down.  That was the same conversation.

14 Q    Okay.  And help me.  You stated that you asked him to --

15 you said that he violated because he failed to follow your

16 instructions, but when you asked him to do anything, you

17 said -- I believe you said early on in testimony that he

18 complied?

19 A    When I asked -- the calming down was the failure to follow

20 instructions.

21 Q    Okay.  So are you saying he failed to follow your

22 instructions because he called you a jerk?  Is that what you

23 are telling us today?

24 A    Well, I mean, that was part of the aggressive behavior,

25 so, yes.

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1  Q    And that's failing to -- and following your instructions

2  is by someone -- I mean, did you tell him -- I am just trying

3  to understand.  Failing to follow your instructions is by him

4  expressing --

5  A    The continued aggressive behavior.

6  Q    Did you -- okay.  I just want to make sure I understand

7  why you feel that he failed to follow your instruction.  I

8  believe that you also said that you were in fear of your life

9  on that day?

10  A    I felt unsafe.

11  Q    You felt unsafe.  Did he throw something at you?

12  A    He did not throw anything at me, no.

13  Q    Did he jump towards you?

14  A    No.

15  Q    Did he stand up and maybe, you know, bolt toward you and

16  do anything that could have been aggressive to make you feel

17  that he was going strike you in any kind of way?

18  A    He did not come towards me, no.

19  Q    Okay.  And you're saying that you felt unsafe or -- unsafe

20  that day because he called you a jerk?

21  A    No, that's not what I am saying.

22  Q    You said you felt unsafe because he had aggressive --

23  because he was upset about you telling him not to text message?

24  A    It was the continued -- the agitation, the pacing, the

25  throwing things, the name calling.  The combination of all of

1  it --

2  Q    You said when you asked --

3  A    -- made me feel unsafe.

4  Q    And so you felt unsafe, but you did tell him to stop

5  pacing, and he stopped pacing?

6  A    I asked him to sit down.

7  Q    And he sat down?

8  A    He did but --

9  Q    So he stopped pacing?

10        **THE COURT:**  Please don't interrupt the witness with a

11  new question until she's finished answering your question.  Are

12  you done?

13        **THE WITNESS:**  Yes, sir.  I asked him to sit down and

14  he sat down, but he continued hitting things off tables and the

15  name calling.

16  **BY MS. PRYOR**

17  Q    When you asked him to stop hitting things off the table,

18  did he stop hitting things off the table?

19  A    I left.

20  Q    So you didn't -- okay.  I believe you mentioned something

21  about a Tor mail message, I believe is what you mentioned?

22  A    I believe it is called a Tor account.

23  Q    I have no clue what that is.  I apologize.  But it's a --

24  does it sound like it is an email account?

25  A    My understanding of it, which is very limited, is it's an

1  anonymous email server that sends whatever you want to send

2  that cannot be traced -- it could be traced, but I am assuming

3  that the providers do not work with law enforcement.

4  Q    Did you investigate whether -- I believe you -- did you

5  investigate whether Mr. Hill sent an email message through Tor,

6  I believe is what you called it?

7  A    No.  I mean, I investigated no further than I could with

8  the information that I had.

9  Q    Okay.  So at this time you cannot state with sufficiency

10 that he used the email to send a message through Tor?

11 A    As I stated earlier, I cannot prove that he did.

12 Q    Just a question about when Mr. Hill was not in compliance.

13 You could have served him with a summons versus a warrant?

14 A    Based on his behavior that day, I didn't feel like that

15 was the safest option.

16 Q    Okay.  But could you have served him with a summons was my

17 question?

18 A    That's always an option, yes.

19 Q    You did know that Mr. Hill suffers from diabetes?

20 A    I do.

21 Q    And you do know that he's insulin dependent, meaning

22 there's three times a day he has to take his insulin?

23 A    I do, and I informed the Courts of that and the marshals.

24 Q    Okay.  And you do remember in the PSR where it stated that

25 it's probably not a good idea to incarcerate him if you don't

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1  have -- if it's -- if it's not necessary due to his health and

2  his mental health issues?

3  A    I don't remember that specifically in there.

4  Q    Okay.  And do you remember whether it stated that he would

5  probably -- not only did he suffer from post-traumatic stress

6  disorder when he was incarcerated the first time, but also he

7  has a tendency to be bullied in prison --

8  A    I did read --

9  Q    -- or in custody?

10 A    I did read that people who have autism -- that that can be

11 a factor, yes.

12 Q    And you said that you recommended that he goes to Piedmont

13 to get treatment services?

14 A    Yes, ma'am.

15 Q    Okay.  Did he comply with that particular order?

16 A    He was going to Piedmont, yes.

17 Q    And he went to -- to your knowledge, he's went to all of

18 his particular treatment except for one, I believe you stated?

19 A    I believe so, yes.

20 Q    And you spoke to his parents about the one that was

21 missed?

22 A    Yes, we did speak about it.

23 Q    Do you remember -- do you recall what -- the reason why he

24 missed that particular appointment?

25 A    I believe they stated that it was because of a

1  transportation issue.

2  Q    Okay.  Does Mr. Hill drive?

3  A    He does not.

4  Q    Okay.

5            **MS. PRYOR:**  I have further questions, Your Honor.

6            **THE COURT:**  Any redirect?

7            **MR. RAMASWAMY:**  Briefly, Your Honor.

8                        REDIRECT EXAMINATION

9  **BY MR. RAMASWAMY**

10 Q    In your -- in the petition under general adjustment under

11 supervision, you make the statement that Mr. Hill -- his

12 initial supervision history has been challenging based on

13 numerous mental and physical health conditions present.

14      This incident on April 28th of this year, was that -- has

15 that been the only incident of its type or has it been an

16 incident to just a degree within the same type?

17 A    As far as the hitting of things and the name calling,

18 that's the first, but every interaction -- because Mr. Hill

19 believes that he's been set up in this case, and he's very

20 adamant about that, every interaction is difficult because I am

21 trying to get him to comply with conditions from the Court, and

22 he doesn't think he should have to.  He will always say that he

23 will comply ultimately, but it's always a struggle.

24 Q    Following up on that, your statement -- I want to ask you

25 about that statement:  He doesn't think he has to comply with

1  the conditions.  Is that the conditions of his supervised

2  release?

3  A    It is.  He predominantly has issues with the sex offender

4  treatment piece of it.  He has gone to those appointments, and

5  I am not saying that, but there is a lot of pushback from any

6  of that stuff.  When I addressed the psychiatrist meeting that

7  was canceled with Mr. Hill, it was that he didn't think he

8  needed it.  The transportation issue came up at a later date

9  when I spoke with the family.  So he thinks that and has

10 expressed to me that he believes I am overstepping my bounds to

11 be involved with any of that.

12         **MR. RAMASWAMY:**  No other questions.

13         **THE COURT:**  Let me ask you, ma'am, the telephone that

14 you said the Defendant was using, whose phone was he using?

15         **THE WITNESS:**  My understanding is it's his

16 grandmother's.

17         **THE COURT:**  Did you say that there was -- there were

18 images of child pornography on the phone?

19         **THE WITNESS:**  The first phone that he had, he

20 indicated he got an email -- or a text message that had child

21 pornography on it.

22         **THE COURT:**  The first phone he had on supervision?

23         **THE WITNESS:**  On supervision.  That was also his

24 grandmother's.  He stated he used it for legal purposes, and

25 that someone had sent him child pornography.  He knew it was

1 | child pornography because he had accidentally looked at it.  He
2 | turned the phone over to me within a couple of days.  I have
3 | not looked at the phone because I don't want to destroy any of
4 | the evidence that's on it.
5 |      **THE COURT:**  How would the child pornography be on
6 | that original phone?
7 |      **THE WITNESS:**  He indicated that somebody sent it to
8 | him in an attachment in a text message or a multimedia message.
9 |      **THE COURT:**  Do you know who it came from?
10 |      **THE WITNESS:**  I believe it was another Tor-type
11 | account is my understanding.
12 |      **THE COURT:**  When was that?
13 |      **THE WITNESS:**  Hold on one second, I will give you a
14 | date.  I seized the phone March 9 of 2015.
15 |      **THE COURT:**  Is this a prepaid phone?
16 |      **THE WITNESS:**  It is, yes, sir.
17 |      **THE COURT:**  Do you have any idea how somebody with a
18 | prepaid phone would anonymously receive child pornography?
19 |      **THE WITNESS:**  I do not, no.
20 |      **THE COURT:**  Does the Defendant have a computer?
21 |      **THE WITNESS:**  He does have a computer, but it does
22 | not have access to the Internet.
23 |      **THE COURT:**  You said there are other computers in the
24 | house?
25 |      **THE WITNESS:**  I believe his mother has a laptop, but

1  I don't know that for sure.

2          **THE COURT:**  Does it have Internet access?

3          **THE WITNESS:**  My understanding is that it does

4  because she has a YouTube channel that I have seen.

5          **THE COURT:**  Do you know whether or not the Defendant

6  has used the mother's computer to send any documents?

7          **THE WITNESS:**  I do not.  I have not had any access to

8  that.  Also to answer your prior question, Ms. Hill also sends

9  me emails on Brian's behalf.  So something has to have access

10 to the Internet.

11         **THE COURT:**  Does anybody have any questions limited

12 to just my examination.  Mr. Ramaswamy?

13 **BY MR. RAMASWAMY**

14 Q   Ms. Burton, do you know whether or not there is wireless

15 Internet access within the home?

16 A   I do not, no.

17 Q   For instance, Mr. Hill's mother's computer, do you know if

18 it has a wired connection?

19 A   I do not know.  I have never been in her apartment, so I

20 can't say.

21 Q   Is Mr. Hill's computer a laptop or a desktop?

22 A   It's a laptop.

23         **MR. RAMASWAMY:**  No other questions.

24         **MS. PRYOR:**  I just have one question.

25                    RECROSS-EXAMINATION

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1  **BY MS. PRYOR**

2  Q     When you stated that he turned over the phone to you, did

3  he voluntarily do that?

4  A     Yes, ma'am.

5  Q     You didn't ask him any questions about it?  He just

6  voluntarily contacted you or how -- I'm sorry.  Help me

7  understand.  How did you get the phone?

8  A     He did contact me to indicate -- we'd had a previous

9  incident where information -- I was told by the family and him

10 that the Mayodan Police Department had returned evidence to

11 them that contained child pornography.  When I asked to see

12 that, they indicated it had been destroyed.  During that time,

13 I indicated that if this ever happens again or anything like

14 that ever happens to let me know.  So he contacted me after

15 receiving that email -- or text message, sorry, whatever it

16 was, and he turned it over to me within a couple of days.

17 Q     So he voluntarily did it?

18 A     Yes.

19         **MS. PRYOR:**  Thank you.  No further questions, Your

20 Honor.

21         **THE COURT:**  You may step down thank you.  Any further

22 evidence from the Government?

23         **MR. RAMASWAMY:**  No, Your Honor.

24         **THE COURT:**  I am going to take a break in just a

25 moment.  Do you have any evidence that you want to put on?

Case 1:13-cr-00435-TDS  Document 123  Filed 08/21/15  Page 38 of 84

1              **MS. PRYOR:**  Yes, Your Honor, I have two witnesses,

2     Your Honor.

3              **THE COURT:**  Do you know how long you intend to have

4     them take?

5              **MS. PRYOR:**  Your Honor, definitely way less than

6     that, Your Honor.  Maybe half of that.

7              **THE COURT:**  Okay.  We are going to take a break for

8     15 minutes, and then we'll come back.  After you put your

9     witnesses on, one of the things I am going to ask you,

10    Ms. Pryor, is I have a slew of pro se things that your client

11    has filed.

12             **MS. PRYOR:**  Yes, Your Honor.

13             **THE COURT:**  I want to understand whether or not he is

14    intending to proceed on any of those or not.

15             **MS. PRYOR:**  Yes, Your Honor.

16             **THE COURT:**  So if you would have a discussion with

17    him --

18             **MS. PRYOR:**  I will.  I will talk to him right now.

19             **THE COURT:**  -- and I would like to have you address

20    that issue.  We'll take a break for 15 minutes.

21         (The Court recessed at 3:37 p.m.)

22         (The Court was called back to order at 3:54 p.m.)

23         (The Defendant was present.)

24             **THE COURT:**  Ms. Pryor, do you want to call your first

25    witness, please?

1    **MS. PRYOR:**  Yes, Your Honor.  I call Ms. Hill to the

2  stand.

3  **ROBERTA HILL**, DEFENDANT'S WITNESS, at 3:54 p.m., being first

4  duly sworn, testified as follows:

5                        DIRECT EXAMINATION

6  **BY MS. PRYOR**

7  Q    Can you give us your name and where you live.

8  A    I'm Roberta Hill.  I live at 916 Chalmers Street,

9  Apartment B, Martinsville.

10  Q    Thank you.  And I want to go back a little bit to some

11  history of who Mr. Hill is.  Can you tell me the first year

12  that you recognized that Mr. Hill might have had some

13  developmental problems?

14  A    It was whenever he was two years old.  He had problems

15  with -- like whenever I would call him, call his name, he

16  wouldn't respond.  I would keep asking -- you know, calling his

17  name.  He didn't appear to know what was going on.  I got

18  him -- a developmental test done, and he had PDD-NOS, which is

19  Pervasive Developmental Disorder, Not Otherwise Specified.

20  Q    Okay.  And when did you first find out that he had autism?

21  A    He was four years old.  His -- he was going to a special

22  preschool program, and his teacher kept saying that his

23  behavior was autistic like.  So she made an appointment for

24  TEACCH to do the test to see if he had autism.

25  Q    Okay.  And what was the result of that?

1  A    Yes, he did have autism, mild autism.

2  Q    And have you been his care -- I believe he is now 25.

3  Have you been his caretaker all of his life?

4  A    I have.

5  Q    Has he been able to work throughout his life?

6  A    No, he hasn't.

7  Q    When I say "caretaker," does that mean that you cook his

8  meals?

9  A    Yes, I do.

10 Q    I believe he has diabetes; correct?

11 A    Yes.

12 Q    And so have you been the primary person to help him with

13 the insulin and how to effectively take his insulin?

14 A    Yes, I have.  I did his shots for 14 years, checked blood

15 sugars, and I still do check his blood sugar.  I have to check

16 it every morning when he is sleeping because that's when he

17 tends to have a lot of low blood sugar problems.  Then I have

18 to treat it.  Sometimes it can be 20s, and I have to feed him

19 ice while he is asleep to try to bring it up and then retest

20 his blood sugar to make sure that it has gone up.

21 Q    Okay.  And have you worked throughout this -- I believe

22 you said you have been taking care of him for 25 years.  Have

23 you worked throughout the 25 years?

24 A    No, I have not.  I did a few odd jobs at certain periods

25 during that time and found that I was unable to.  The school

1  kept calling me to come and assist him.  They only had a nurse

2  available one day per week.  So a lot of times I would have to

3  go to the school and give him shots.

4  Q    Okay.  And has he -- have you been able to have any other

5  assistance with helping Mr. Hill?

6  A    At certain periods, whenever he was younger, I was able to

7  get on respite programs that helped out, you know, maybe just a

8  few hours a week, like four hours, maybe five hours a week,

9  certain programs, but not a whole lot, no.

10 Q    Okay.  I understand.  And so now I just want to talk about

11 the Internet access in your home.  Do you guys have Wi-Fi in

12 the home?

13 A    Yes, we do.

14 Q    Okay.  And how -- and is Mr. Hill able to access the

15 Wi-Fi?

16 A    No, he is not.  He has a desktop computer, and we got the

17 chip removed from the computer that allowed Wi-Fi access; and

18 we showed it to his probation officer that the chip was

19 removed.

20 Q    Okay.  And also I believe they said that you have also a

21 computer; correct?

22 A    Yes, I have a laptop computer, but it is password

23 protected.

24 Q    Okay.  And does Brian know that password, or have you

25 shared that password with him?

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1  A    No.

2  Q    And so you do understand all of the conditions that the

3  judge ordered based on him coming home?

4  A    Yes.  I've read through all of the conditions.

5  Q    Okay.  And you've done what you could to help to make sure

6  that he complied with those conditions?

7  A    Right.  We removed the chip from his computer so he has no

8  Wi-Fi access.  There is no Wi-Fi access from his apartment, and

9  my and my parent's computers are password protected.

10 Q    Okay.  I believe they said that he has a phone that he's

11 able to use.  On that phone, does he have access to Wi-Fi on

12 that phone?

13 A    No.  It's strictly used for texting.  There is no Internet

14 access on that.

15 Q    And were you present the day that Miss -- Officer Burton

16 came to the home that day?

17 A    I was.

18 Q    Okay.  And do you remember Mr. -- do you remember the

19 basic dialogue that day?

20         **THE COURT:**  Are we talking about April the 28th?

21         **MS. PRYOR:**  Yes, sir, I apologize, April 28th.

22         **THE WITNESS:**  Yes, I do.  She informed him that he

23 was no longer able to text.  I don't remember her mentioning

24 anything about multimedia, but she did inform him that he

25 should no longer be texting, that he was not allowed to text

1    the Court, and he told her that, yeah, he had already been told

2    that by the Court, not to text, so he was no longer doing any

3    of that.

4            He was -- he asked if he was able to text his

5    friends.  She said no.  He asked if he was able to text his

6    attorney, and she said no, which we're just talking about

7    regular texting.  There was no Internet usage on the phone.  It

8    was just regular texting and texting is a completely separate

9    system than the Internet.

10   **BY MS. PRYOR**

11   Q    Okay.  And just to help the Court understand communication

12   with Mr. Hill -- we do all know that he definitely suffers from

13   autism.  When you are telling him that he cannot do something

14   of that nature, have you guys set up a plan or have you guys

15   understood or have a way that you guys speak to him about

16   things of that nature?

17   A    Yeah, you can't make a sudden change with an autistic

18   person.  That does not work out very well.  It has to be a

19   gradual change.  Any change in routine will get an autistic

20   person upset.  You are going to get behavior problems.  Once

21   behavior escalates, you cannot communicate with an autistic

22   person.  They will not understand what you are saying.  You

23   have to -- you have to kind of give them time to process the

24   information.  So that means kind of walk away a minute, give

25   them time to process it.  Make sure he is nice and calm before

1  you attempt to explain it again.  If behavior escalates again,

2  then you are not going to get anywhere.  Communication is not

3  going to happen.  Again, you have to give time for the

4  processing to begin.

5      I don't know how better to explain it.  It's not ignoring.

6  It's not saying, well, Brian is going to get his way.  No.  It

7  is saying that you just need to allow plenty of processing

8  time.  If you have to bring on a change, it has to be slowly.

9  You can't do it quickly.  That will never work.

10 Q    And this information that you are talking about is this

11 because of treatment that he's had over the years?

12 A    Yeah, I've learned a lot of stuff through TEACCH.  They

13 helped me to learn.  I went to several seminars to learn about

14 autism, and, you know, I've read a lot over the years, too; but

15 learning Brian, being around him for all these years, I have

16 learned a lot on my own, too.  I've learned tricks and ways to

17 deal with bringing about changes like that.  That's why I say

18 this is from years of learning.

19 Q    Okay.  And on the date of April 28th, when Brian got

20 agitated, would you state that you felt in fear of your life

21 that day?

22 A    No, I did not.  He did attempt to walk away to get calm

23 again.  He wanted to give himself a shot because he had just

24 ate and he knew -- he was aware that his blood sugar was going

25 up.  We would allow that.  He needs time to calm down, get his

1  thoughts together, and he needs time to process that, but she
2  would not allow that.  She brought him back, you know.  He was
3  trying to walk out so that he could go do his shot and get
4  himself calm.  She brought him back; therefore, he had no time
5  to process what was going on.  His blood sugar was high.  So,
6  again, that just aggravated the problem.  It's like pouring gas
7  on a fire.
8  Q    Okay.  And once Officer Burton left, did Mr. Hill calm
9  down?
10 A    Yes, he did.  We gave him time to calm down, and once he
11 calmed down, he was apologetic.  He could start thinking again.
12 You could communicate with him.
13 Q    Did he apologize to Officer Burton?
14 A    Yes, he did.
15 Q    Did he do that by phone or email -- I mean, not email, by
16 letter?  I'm sorry.
17 A    He made some phone calls and apologized, and I emailed on
18 my computer an apology to her as well.  Later on, I believe he
19 might have faxed her, too, but, yes, he did make apologies.
20 Q    Okay.
21           **MS. PRYOR:**  I have no further questions, Your Honor.
22           **THE COURT:**  Any cross?
23           **MR. RAMASWAMY:**  Yes, sir.
24                    CROSS-EXAMINATION
25

Case 1:13-cr-00435-TDS  Document 123  Filed 08/21/15  Page 46 of 84

1  BY MR. RAMASWAMY

2  Q    Ms. Hill, your son has filed -- do you know whether or not

3  he's filed pro se pleadings on his own behalf in his matter?

4  A    Yes, he has filed several pro se motions.  Even for the

5  last month that he's been in jail, he has done several pro se

6  motions.  That has nothing to do with me.  Those are his own

7  decisions.  His attorney -- two attorneys have told him not to.

8  He is still doing that.

9  Q    Have you ever read any of those?

10 A    I read them after they get put on PACER.

11 Q    Have you seen, not the most recent ones, but the ones

12 prior to that on the signature block end with an email address

13 admin@uswgo?

14 A    No, I haven't seen anything like that.

15 Q    You haven't seen that that email address is included in

16 ECF filings?

17 A    I don't recall seeing any emails, no.

18 Q    That's your son's email address, or was prior to his

19 conviction for this offense, wasn't it?

20 A    The one for uswgo, but he's not -- he can't -- there is no

21 way he can get into his email account.

22 Q    Is there any limitation between your son's access to his

23 own living area, his own apartment, and your own or his

24 grandparents'?

25 A    Can you repeat the question?

1  Q    Can your son get to your living area, your apartment?

2  A    Yes.

3  Q    Do you know whether or not his grandparents have a

4  computer?

5  A    They do, but they're all password protected.

6  Q    You don't know whether or not your son has a way to evade

7  or avoid the password protection, do you?

8  A    No.  There is no way he would be getting on our computers.

9  Q    When you say "there is no way," haven't you previously, to

10 the probation officer who did the presentence report interview,

11 described your son as a computer genius?

12 A    Well, he is pretty good with computers, but I don't see

13 how he would be able to get into our -- I mean, break the

14 password without being on some type of Internet connection.  I

15 mean, I don't see how he could get that Internet connection

16 before trying to attempt a password break.

17 Q    Do you remember making the statement that your son is a

18 computer genius?

19 A    Yes, he does very well with computers.  I don't see how he

20 could get into our passwords without Internet access.

21 Q    Was there an incident in which he struck his grandfather?

22 A    Yeah, his grandfather put his hand on his shoulder, and

23 there was a reflex thing where he just kind of, you know,

24 struck back, reflex thing, and it didn't really hurt his

25 grandfather.

Case 1:13-cr-00435-TDS   Document 123   Filed 08/21/15   Page 48 of 84

1  Q    And were there incidents in the past where he assaulted

2  you?

3  A    No.

4  Q    Now, you've actually written a book about raising your

5  son, haven't you?

6  A    Yes, I have.

7  Q    And in that book, you state that he was diagnosed with

8  what is called Intermittent Explosive Disorder, haven't you?

9  A    Yes, he is.

10 Q    And you also describe your book and the incidents

11 involving your son in a YouTube video, don't you?

12 A    Yes.

13 Q    In that YouTube video, don't you describe how your son in

14 past occasions assaulted you?

15 A    When he was little, he used to hit.  He used to pull hair.

16 I would -- that was a very long time ago.  I mean, that -- I

17 think every kid has done stuff like that.  I wouldn't consider

18 it to be assault.  I've never had to go to the hospital.  I've

19 never been injured.

20 Q    Well, you describe them as tantrums, don't you?

21 A    Right, tantrums.

22 Q    And you said in some cases he would turn bookcases over?

23 A    Yes.

24 Q    And he would hit and bite you?

25 A    Yes.  This was whenever he was probably about five years

1   old.

2   Q    Well, the most recent video in which you described these

3   is just from last December; correct?

4   A    Right.

5   Q    And you said that they have -- the tantrums have decreased

6   with age, but they are rare now?

7   A    Yes.

8   Q    So they still occur now, don't they?

9   A    Yes, every once in a while, not at the same intensity as

10  whenever he was younger.  We're talking little tiny tantrums

11  now.

12  Q    So there are incidents in which your son has tantrums and

13  can't control his behavior?

14  A    They're really -- they are so tiny compared to where he

15  has been that I don't really consider it to be that much of a

16  problem.

17  Q    When Ms. Burton was -- the incident from -- I'm sorry,

18  April 28th, you were present?

19  A    Uh-huh.

20  Q    And was it your statement that Ms. Burton didn't give your

21  son enough time to process information?

22  A    Yes.

23  Q    And that led to his lack of compliance or his anger?

24  A    Well, he has trouble processing sudden changes like that.

25  That's a part of his autism.

1  Q    Was he hitting things off of tables in front of her?

2  A    Yes.

3  Q    Did he raise his voice to her?

4  A    Well, yeah.

5  Q    Did he swear at her?

6  A    Yeah.  In no way was that putting anybody in danger.

7  Q    Well, that's in your opinion; correct?

8  A    Yes, it is.

9          **MR. RAMASWAMY:**  No further questions.

10          **THE COURT:**  Anything further?

11          **MS. PRYOR:**  Nothing further, Your Honor.

12          **THE COURT:**  All right.  Thank you, ma'am.  You may

13  step down.

14          **MS. PRYOR:**  I just have one more, Your Honor, his

15  grandfather.

16  **KENNETH FORINASH**, DEFENDANT'S WITNESS, at 4:12 p.m., being

17  first duly sworn, testified as follows:

18                          DIRECT EXAMINATION

19  **BY MS. PRYOR**

20  Q    Can you state your name and your address for the Court.

21  A    My name is Kenneth Forinash.  My address is 916 Chalmers

22  Street, Martinsville, Virginia, Apartment A.

23  Q    Thank you.  Mr. Hill is your grandson; correct?

24  A    Yes.

25  Q    And you -- and I believe you live in the same building

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1   with Mr. Hill?

2   A    Yes.

3   Q    And I believe you stay upstairs, and he stays downstairs?

4   A    Right.

5   Q    Okay.  And so you have a lot of interaction with Mr. Hill?

6   A    Yes.

7   Q    Okay.  And how long have you guys been staying in this

8   type of situation where he stays downstairs and you stay

9   upstairs?

10  A    Since August of 2013, I believe.

11  Q    Okay.  So about two years almost?

12  A    Yeah.

13  Q    Okay.  Before that, where were you staying?

14  A    They lived in Mayodan, North Carolina, at the time.

15  Q    Okay.

16  A    We lived in Martinsville.

17  Q    But you would visit all the time?

18  A    Oh, yeah.

19  Q    Okay.  And they mentioned an occasion, I believe it was

20  actually probably the same day on April 28th, that Mr. Hill

21  struck you?

22  A    No, it was prior to that.

23  Q    I apologize.  Prior to that.  Okay.

24  A    We were all upset about something, and Brian was pacing

25  back and forth, and he was -- kept getting louder, and I stood

1  up and put my hand on his shoulder to try to calm him down, and

2  his reflex action was that he turned around and hit me.  It

3  didn't hurt.  And a few minutes later, we all apologized and

4  everything was okay.

5  Q     On that occasion, I believe Officer Burton also came by

6  that day when this happened?

7  A     Yes.

8  Q     Did you guys explain that to her as well?

9  A     Yes.

10 Q     And did you feel like you were in fear of your life that

11 day?

12 A     No.

13 Q     Okay.  Did you feel like Mr. Hill was a danger to himself

14 that day?

15 A     No.

16 Q     Okay.  Did you feel like he was a danger to his mom that

17 day?

18 A     No.

19 Q     Okay.  His grandmother that day?

20 A     No.

21 Q     Okay.  And you were also present on April 28th; correct?

22 A     Yes.

23 Q     Okay.  And on that day, I believe you answered the door?

24 A     Yes, I did.

25 Q     Okay.  And Mr. Hill was -- and you had an opportunity to

1  hear the conversation between Mr. Hill and Officer Burton?

2  A    Yes.

3  Q    And so you did see where Mr. Hill began to get agitated?

4  A    Yes, I did.

5  Q    Did you feel like you were in fear of your life when he

6  got agitated?

7  A    No.

8  Q    Did you see him throw anything at Officer Burton?

9  A    No.

10 Q    Did you see him charge at Officer Burton that day?

11 A    No.

12 Q    Did Mr. Hill -- I believe they said he was pacing back and

13 forth; is that correct?

14 A    Yes.

15 Q    Did Officer Burton ask him to sit down?

16 A    Yes.

17 Q    And he complied?

18 A    Right, yes.

19 Q    Was there any lack in his compliance that day?  Everything

20 that she asked him to do, did he do that day?

21 A    He did it right away.

22        **MS. PRYOR:**  I have no further questions, Your Honor.

23        **THE COURT:**  Any cross?

24        **MR. RAMASWAMY:**  No, sir.

25        **THE COURT:**  All right.  Thank you.  You may step

1  down.

2           Any further evidence from the Defendant?

3           **MS. PRYOR:**  No, Your Honor.  Just like to be heard at

4  the appropriate time, Your Honor.

5           **THE COURT:**  Mr. Ramaswamy, I'll start with you.

6           **MR. RAMASWAMY:**  Your Honor, there are a few key

7  things I want to address but, in particular, Ms. Burton's

8  statement.  In dealing with Mr. Hill, every interaction is

9  difficult.  He doesn't think he has to comply with his

10 conditions.  He doesn't think he needs it, that there is a

11 general, I would say over time, of Mr. Hill's belief -- despite

12 his guilty plea, despite in the presentence report his written

13 statement admitting responsibility, that he wants to now undo

14 the conditions that are upon him.

15          While it may seem minor, the incident with the

16 probation officer on April 28th, 2015, in terms of a violation,

17 I would say it is pretty basic.  In the introduction in Chapter

18 7 to the supervised release violation section of the

19 guidelines, there is a discussion about the Sentencing

20 Commission's approach to supervised release violations, whether

21 they are going to take the breach-of-trust theory or the

22 new-conduct theory; and, ultimately, they take the

23 breach-of-trust theory.

24          The conduct that the Court has heard, I would

25 contend, goes to the breach-of-trust theory.  It would appear

        USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1  that in a sense the probation officer is being blamed for her

2  lack of understanding of Mr. Hill's condition.

3      **THE COURT:**  I am not going to put the probation

4  officer on trial for whether or not she properly or improperly

5  prepared for this meeting.  I am not going to do that.  So if

6  that's a concern -- I will hear about whether you can explain

7  the Defendant's conduct because of that, but this is not the

8  probation officer being put on trial here, and we are not going

9  there.

10      **MR. RAMASWAMY:**  All right, sir.

11      I would recognize, and I think from the beginning of

12  this case the Government has recognized, that the conditions of

13  Mr. Hill, as outlined in the presentence report, leading to the

14  disposition, that he did receive under the -- as accepted by

15  the Court, an effectively

16  time-served-followed-by-supervised-release sentence.

17      But I would note, not to go through any more of his

18  pro se filings than this, in Document 105, and that was filed

19  on June 5th following his arrest on the petition, Mr. Hill goes

20  through several things he's promising -- he is going to promise

21  to do, change his behavior -- it's entitled "Promise of Change

22  Following Reinstatement of Supervised Release," and he is going

23  to agree to notify his probation officer when he's, for

24  instance, angry or his blood sugar is low.

25      Mr. Hill isn't under -- it's not contractual, his

1  conditions on pretrial release.  It's part of his judgment that

2  he is under.  The contractual part was part of the plea

3  agreement, and that part is over, but I think it goes to that

4  same thing.  He feels -- Mr. Hill feels he doesn't have to

5  comply with these conditions and is selectively following them.

6  I would also note, not on this filing, but in many of the prior

7  pro se filings, they end with an email address and --

8          **THE COURT:**  What's the most recent one that does

9  that?

10         **MR. RAMASWAMY:**  I don't have -- I apologize to the

11 Court.  I don't have all the pro se filings here, but in the

12 ones prior to his arrest on the petition for the supervised

13 release violation, in the signature block in the certificate of

14 service, you will see an email address accompanying his name

15 and address.

16         **THE COURT:**  When was he arrested?  Was it in May?  I

17 have he was detained May 27th; is that right?

18         **MR. RAMASWAMY:**  I believe that is correct, Your

19 Honor.

20         I don't believe there is sufficient -- I don't want

21 to rely that heavily -- and I understand the Court's

22 instruction as the inquiring as to email access.  I don't wish

23 to rely on that so much from the violation.  I do think it

24 would only be an inference as to email access.  I do think --

25         **THE COURT:**  Is there evidence he is using the

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1  Internet?

2         **MR. RAMASWAMY:**  No, sir, I don't think there is

3  evidence he is using the Internet.  There is only an inference

4  that he's found a way to access the ECF filing system by using

5  a prepaid cellular phone.

6         **THE COURT:**  How do you do that without getting on the

7  Internet?

8         **MR. RAMASWAMY:**  I can tell the Court -- I can tell

9  the Court, but it is only my own knowledge, how that might be

10  done, but there is actually more than one way it can be done.

11  It might be done from a cell phone.  It might be done through a

12  portal that's referenced in there, MyPix messages portal, on a

13  regular computer where it appears to be coming from that cell

14  phone number, but there is no evidence as to which way --

15         **THE COURT:**  Wouldn't the Defendant still have to have

16  some way to get on the Internet eventually?

17         **MR. RAMASWAMY:**  Yes, sir.

18         **THE COURT:**  Is there any indication that the filings

19  that he's made with the Court were emailed in some fashion via

20  a way that did not use the Internet?

21         **MR. RAMASWAMY:**  I don't think there is evidence of

22  that.  I think there is evidence that in the particular message

23  sent from the phone, as what would appear to be an email

24  message to the District Court, that there were several people

25  carbon-copied on that, but that doesn't -- I don't know that it

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1  gets into proof that that's access to the Internet.  It's a

2  means of inter -- interactive electronic communication, but I

3  don't know that that's the focus of what the Government is

4  arguing here.  It is that Mr. Hill has decided to evade and

5  avoid certain conditions or has presented a safety issue to his

6  probation officer.

7          **THE COURT:**  So let me -- the safety issue I

8  understand.  Beyond that safety issue, what else is it that you

9  are contending is a violation or a problem?  You said "avoid"

10 or "evade."  What are you talking about?

11         **MR. RAMASWAMY:**  When the probation officer talks

12 about her interactions -- this home situation -- in an ordinary

13 situation, I would say -- I am going to phrase this in a way

14 where I am not appearing to ask for the officer's authority to

15 search other people's computers, but what she described as

16 supportive but co-dependent and placating the Defendant.

17         The Defendant -- the conditions upon him -- and I

18 think you can see from the testimony of his mother and

19 grandfather, some minimizing as to his conduct here.  The

20 persons he's living with are minimizing, and that the

21 conditions of computer usage --

22         **THE COURT:**  Well, what I am hearing is that they are

23 trying to explain that he's autistic and that you have to deal

24 with somebody who is autistic a little differently and that

25 they, from time to time, may do things that an ordinary person

1   would not do.  Whether that's what you are talking about in

2   terms of minimizing or whether you are talking about something

3   else, I don't know.

4           **MR. RAMASWAMY:**  I think that's fair to say, and I

5   wouldn't expect in a family situation really that would be

6   different, but I don't know how that can be squared with the

7   probation officer's responsibility to do her supervision.

8           **THE COURT:**  I understand.  All right.  Anything

9   further?

10          **MR. RAMASWAMY:**  No, sir.

11          **THE COURT:**  Thank you.  Ms. Pryor?

12          **MS. PRYOR:**  Yes, thank you, Your Honor.

13          Your Honor, I've had the opportunity -- I know you

14  asked about the access to Internet by MMS or SMS.  I've

15  actually had the opportunity to speak to someone who is

16  actually a specialist and an expert dealing with the Internet

17  and how the cell phones and all that work.  I explained to him

18  exactly what Mr. Hill was doing.  I contacted the clerk to find

19  out how did she receive it so that I could accurately tell --

20  and let me get his name for you, Your Honor -- so I could

21  accurately tell him what was being stated and what was being

22  used.

23          Mr -- and I apologize.  Let me get his name for you.

24  That would be Mr. Levitan.  He's with the wireless, cellular,

25  telecommunication consulting and expert witness services.  He

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1  does, of course, testimony in federal cases of this nature

2  regarding whether it was an MMS or SMS or whether it was

3  Internet based, especially when it deals with child

4  pornography.

5  He explained to me over and over again that no way

6  does MMS or text messaging have anything to do with the

7  Internet.  In no way, can they have -- can you even -- I mean,

8  it does not contract [sic] your Internet.  It does not even --

9  there's no need to use the Internet to do those type.  Text

10  messaging, MMS, the only difference is the size of the actual

11  thing that you are sending.

12  **THE COURT:**  So how does he have a cell phone that

13  receives an image of child pornography through a Tor account?

14  **MS. PRYOR:**  Your Honor, that is a question, I

15  apologize, I did not ask Mr. Levitan.  I am going to assume, as

16  the Government has said, based on my personal knowledge, that

17  you can send to a phone number -- if you know the person's

18  phone number -- in the way that our cell phones, I guess, or

19  smartphones work today, if you have a smartphone, you're able

20  to text -- put that number in, and you are able to send a

21  message to them by -- via an email or via a fax or via, you

22  know --

23  **THE COURT:**  I guess my question is -- it sounds

24  highly unlikely that somebody who has a prepaid cell phone

25  would anonymously receive unsolicited child pornography.

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1          **MS. PRYOR:**  Your Honor --

2          **THE COURT:**  Somehow somebody knew to contact that

3   phone.

4          **MS. PRYOR:**  I truly understand that, Your Honor, and

5   I believe that probation has that particular cell phone.  Your

6   Honor, I would love to have that evaluated.  I don't think that

7   Mr. Hill would have any problem with making sure that you

8   understood or making sure that he was able to prove -- as you

9   note, he's been working to prove his innocence of all of this.

10  So I am sure --

11         **THE COURT:**  I don't know what you mean that.  He's

12  admitted guilt as to the underlying offense; right?

13         **MS. PRYOR:**  I understand that.  I believe that, Your

14  Honor, that he is working with another attorney, I guess, to

15  appeal or to -- and, Your Honor, I am not working on that

16  particular matter or that case; but based on my experience with

17  him and my talking with him, it is his desire to prove his

18  innocence of that particular matter.  I believe you've seen, of

19  course, all of the pro se documents filed in this matter

20  regarding that.

21         But just to get to your answer, and what I believe

22  and based on my interaction, the moment that he saw it come --

23  you know, he opened up the text message, he's told me he

24  immediately let Ms. Burton know that it had happened.

25         I mean, to him, and what he's explained to me, is

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1   that he believes that's another way of showing that someone is

2   obviously -- or believes -- or allegedly is setting him up and

3   wants him to be in trouble about child pornography.

4           **THE COURT:**  It seems highly unlikely that people

5   would be able to find a phone number for a prepaid telephone

6   whether to set somebody up, as he says, or to anonymously send

7   child pornography.  It seems more likely that somehow there is

8   a communication with somebody, who then responded and sent

9   child pornography back.

10          So what concerns me is his use of a cell phone for

11  the receipt of child pornography when he's already been using

12  the Internet to receive child pornography.  So that's my main

13  concern about the cell phone.

14          **MS. PRYOR:**  Yes.  I truly understand that, Your

15  Honor.  I believe that he does not have that particular cell

16  phone anymore.  His family does not -- he has to ask permission

17  to receive the phone.  I think they have been very good about

18  making sure that he complies with any order that the judge

19  states.

20          The only -- I think the only issue, as you heard on

21  the stand from his mom, is that I explained to him he can't

22  send any more letters to the Court, that he needs to use his

23  attorney on that basis, but I think they have been very good

24  about making sure that Ms. Burton -- Officer Burton, I

25  apologize, Officer Burton, if she wanted to come in the home --

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1    I heard her say that she cannot search their computer.  I don't

2    believe that they've ever -- I believe they will volunteer, you

3    know, for her to be able to come in and search the computer,

4    whatever she would need, and I am sure they would open up their

5    house.  They want Brian to be compliant with everything that

6    the Court has ordered.

7            **THE COURT:**  All right.  Anything further?

8            **MS. PRYOR:**  Yes, Your Honor.  I would only state,

9    Your Honor -- based on what you've heard today, Your Honor, I

10   would state that there in my -- not -- I apologize.  I would

11   state that there was no violation.  I do not believe that --

12   based on who Mr. Hill is, based on his mental health, his

13   physical health, and the things that I've had the opportunity

14   to interact with him, I do not believe -- and, you know -- and

15   based on mom's testimony, that Mr. Hill in any way violated

16   Officer Burton's instructions or order.  Ms. Burton asked him

17   to sit down, asked him to comply.  He complied with everything

18   that she asked.

19           Being who he is and the disability that he does have,

20   there are things that you must do and ways that you must

21   interact with him.  My first interaction with him -- and you

22   can look at him, and no disrespect at all to Mr. Hill, Your

23   Honor.  He, of course, stands and he looks to be 25.  He has

24   the hair and everything that it takes, but I knew immediately

25   that I could not have the same conversation about a supervisory

hearing as I would a 25-year-old who also violated or did
something of the same nature.

He is just not the type of person that could
understand or be in a position to -- and I am asking the Court
not to hold him to the standard of a regular 25-year-old today
in that I believe that he was not -- that he did not violate
her instructions.  And when he did have the opportunity to calm
down, he understood -- not only did he write it to the Court to
apologize to Officer Burton, he also apologized to her by fax,
I believe, as well as by phone.

I would ask the Court to consider -- being that his
mom and his family has provided a safe environment for him, I
would ask the Court to not hold him -- to not revoke his
supervisory release, but to allow him to return to his home, to
also continue his treatment that he definitely so much needs.
I believe we heard that he missed only one treatment.  Although
he might not believe that he needs it, his mom was still making
sure that he went to the treatment.  He missed one only because
of transportation matters, but he's made every appointment.
They've done everything -- his mom makes sure that he goes to
everything that is ordered by the Court.  So I believe he has a
great supervisor and a great environment to stay in.

Your Honor, if you wanted to place him on home
detention, I don't believe there is any other purpose for him
to leave home but for the purpose of going to his meetings,

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1  going to things like that, and I understand, Your Honor, also

2  if there has to be an order in -- to -- from you regarding his

3  mailings -- pro se filings, that he does that with his attorney

4  and that he has the permission to do that with his attorney

5  only, Your Honor.  I believe that he will comply, Your Honor,

6  and that he will do what you ask him in that particular regard.

7          Thank you, Your Honor.

8          **THE COURT:**  Well, first thing I am going to do is

9  determine whether or not -- what the facts are and whether or

10  not there was conduct here that constitutes a violation of the

11  conditions of supervised release, and the condition that's

12  alleged is that the Defendant shall answer truthfully all

13  inquiries by the probation officer and follow the instructions

14  of the probation officer.

15          I am going to find that the Defendant did make

16  threatening gestures toward the probation officer, Ms. Burton.

17  Now, there may be reasons that explain all of this, but the

18  probation officers have to be able to meet with their clients,

19  with the defendants, and be able to enforce the conditions of

20  supervised release; and it is critical that the defendants

21  comply with the requirements that the probation officer

22  reasonably puts on them.

23          In this instance, the facts, as set forth in the

24  petition, are proven by the record before me, and I find them.

25  Ms. Burton is credible.  In fact, I don't find any fact that's

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

inconsistent with Ms. Burton's story from my point of view;
that is, she on April 28th met with the Defendant and with his
grandparents and his mother, addressed the issue of sending
documents by text to the clerk's office, told him to stop.  He
said he had already done that.  The Defendant became upset.
They addressed the appointment with the psychiatrist that she
arranged that the Defendant had canceled.  The Defendant was
not at that time on his medications for any mental health
issue.  He had attended all of his sex offender treatment
appointments up until that time, but then the Defendant hit
items off the table, threw them onto the floor.  Ms. Burton was
only 8 to 10 feet away.  The Defendant became agitated, called
her a jerk, and twice called her an asshole.  I am not going to
tolerate that kind of conduct.  The probation officers don't
deserve to be treated like that, and they can't work with the
defendants who treat them like that.

          Now, I credit Ms. Burton when she says she felt
threatened enough that she was going to leave.  Others in the
family may have seen this behavior over Mr. Hill's lifetime and
may understand it in a different context, and I understand
that; but in the context of this case, the Defendant made
threatening actions that caused the probation officer to have
some fear about her safety and based on what she observed at
the time.  So she left the residence.

          So I find those facts, and I find that by a

1  preponderance of the evidence that is a violation of his

2  supervised release terms.  They were willful actions, and they

3  were not with any lawful excuse.

4           However, as I said, this all seems to result largely

5  from the Defendant's autism, and so that's a key factor that I

6  am going to take into account.  I am not going to fault

7  Ms. Burton for not dealing with somebody who is autistic in the

8  best way possible.  She's here to do her job as a probation

9  officer, and she's doing the best she can do.  Different

10 defendants have to be treated differently; and through this

11 process, we've all learned a little bit of information perhaps

12 as to how Mr. Hill reacts, and to the extent that can be taken

13 into account, then that will be taken into account.

14          Maybe in the future, if there is an issue, then you

15 can work with the family members and figure out how to approach

16 the situation; but on the other hand, a probation officer

17 doesn't have to always give a heads-up to the family members

18 because sometimes it's not appropriate to do that, and they

19 have to confront somebody.  So I am hopeful that this won't

20 happen anymore in the future; but I'm a realist, thinking that

21 with the Defendant's condition, it's entirely possible that

22 this isn't going to be the first time you are going to have

23 this problem, and it won't be the last time.

24          Now, his original conviction was a Class C felony.

25 It is Criminal History Category I.  This appears to be a Grade

1  C violation.  The guideline calls for 3 to 9 months with the
2  most I could give for imprisonment of 24 months.  He has a
3  10-year supervised release period that he's on.  So any time
4  imposed would be substracted from that.

5          Let me ask, first of all, do the parties agree that
6  that's the proper guideline consideration for purposes of the
7  case?

8          **MR. RAMASWAMY:**  Yes, sir.

9          **MS. PRYOR:**  Yes, Your Honor.

10         **THE COURT:**  Okay.  I am going to conclude we've made
11  that determination correctly.

12         Now, he's been in the jail for a little over a month;
13  right?

14         **MS. PRYOR:**  Yes, Your Honor.

15         **THE COURT:**  Okay.  Now, I give heavy weight to the
16  fact that he's autistic and that he is going to have difficulty
17  controlling some of this.  I also am concerned that he seems to
18  be highly intelligent in some areas, including the use of
19  computers and electronic devices.

20         I am concerned that he had a cell phone that had an
21  image of child pornography on it, which he admits.  Without
22  addressing the issue directly, I think it would behoove the
23  parents and grandparents to consider whether they allow the
24  probation officer to further examine their devices to make sure
25  they are not being used improperly by Mr. Hill.  I am not

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1  ordering that that be done.  You offered, I think, that they

2  were willing to do that.  I simply acknowledge I think that's a

3  good idea.  Whether or not there is a legal right to do it or

4  entitlement, I am not going to deal with that today.  I am

5  trying to just deal with the practical reality of the

6  situation.

7          In light of where we are and what I found as facts --

8  you've made an argument, for the most part, on what you think I

9  ought to do.  Normally, my process for these hearings is at

10 this time to see what you have to say about what I should do,

11 but I think I've heard most of that already.  I haven't heard

12 from Mr. Ramaswamy yet, I don't think.

13         Let me start with you, Ms. Pryor.  You indicated, I

14 think, you thought I should continue him on his supervised

15 release.  Is there anything more you want to add to that?

16         **MS. PRYOR:**  Your Honor, I do agree that you should

17 continue him on his supervised release, Your Honor.  I do

18 believe that he already has a safe home.  I just ask, if you

19 are willing, to allow him to be on home detention or, you know,

20 if electronic monitoring -- if you believe that is, of course,

21 going to do anything different, but definitely home detention.

22 I believe he has a safe home.

23         It's been affecting him -- of course, you've seen

24 through numerous of his complaints, and I know the marshals has

25 done everything that they can to make sure that the jail was

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

taking care of his health-wise, but it has just not been good

for him over at the jail.  I would only ask that you would give

him the opportunity to comply with your order today, allow him

to go home on home detention, and that he be released to his

parents, and to follow any other conditions that you --

**THE COURT:**  One of my concerns about his compliance

is I have a host of pro se documents, which I've reviewed.

**MS. PRYOR:**  Yes, Your Honor.

**THE COURT:**  By reading those, there is clearly an

attitude of defiance and refusing to accept his own guilty plea

and a claim that he's been framed, and he's lashed out at Judge

Osteen, which is why you are before me today --

**MS. PRYOR:**  Yes, Your Honor.

**THE COURT:**  -- calling him crooked and many other

things.

Putting aside the total improper nature of those

filings, it doesn't seem to support an argument that he's now

on board and wants an opportunity to comply.  It seems to

indicate that he is going to fight this every which way,

including what you told me a minute ago, and that's that he's

going to have a separate lawyer look at some other avenue of

relief for him, whatever that might be.

So I have to say I am highly skeptical of his

attitude as to whether he intends to comply.

**MS. PRYOR:**  And I understand that, Your Honor.  And

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1  one of the things that is in his presentence report is that

2  he's obsessive, I believe, or -- Obsessive-Compulsive Disorder.

3  In it, it states about exactly what you are saying is --

4  because he's confined his life literally to this-- I mean, the

5  entire time he's in jail -- he wrote a pro se document every

6  day he's jail.  He not only wrote it and mailed it to us, but

7  he also made a copy -- he'd write an extra copy to give to me

8  as an attorney, so -- and, Your Honor, I don't think that

9  that -- and I can only explain that by, I mean, this is

10  something he was born with.

11        Set aside, you know, I mean, the fact that this is

12  how his mind thinks --

13        **THE COURT:**  Let me ask you this:  Are you adopting

14  any of his pro se papers for purposes of today?

15        **MS. PRYOR:**  Not for purposes of today, no, Your

16  Honor.  I know that he has asked that his other attorney, who

17  is working on the other side, to work on those matters.

18        **THE COURT:**  Have you spoken with him during the break

19  about whether he intends to continue to press any of the pro se

20  documents today or whether he's withdrawing any of them?

21        **MS. PRYOR:**  He's withdrawing them for this particular

22  matter, but he wants his other attorney to pursue his other

23  matters -- his matter at hand.  And I have spoken to him, and I

24  believe that he understood that he -- I believe coming from an

25  order from the judge stating that he can pursue his innocence,

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1  but it has to be through his attorney only, I think he would

2  understand that.  He knows that someone is going to be helping

3  him with that part, but I just have to admit to Your Honor his

4  mental state won't allow him to -- I mean, it's like --

5          **THE COURT:**  While he is represented by counsel, he

6  needs to go through counsel.

7          **MS. PRYOR:**  Yes.

8          **THE COURT:**  I am not going to tell him he can't

9  proceed pro se for all purposes because there will be a period

10 of time when you are not representing him anymore.  So you can

11 make that clear to him when you talk to him.

12         **MS. PRYOR:**  Definitely, Your Honor.

13         **THE COURT:**  However, he should be advised that the

14 Court will not tolerate filings that impugn the integrity of

15 the decision-makers and other officers of the Court, including

16 probation officers, if it is done unfairly or improperly.  So

17 he needs to be very careful about that.

18         **MS. PRYOR:**  I sure will, Your Honor.

19         **THE COURT:**  That's a fair warning at this point.

20 Other judges would have already treated that a different way.

21         **MS. PRYOR:**  And I understand that.  I've actually

22 explained to him that -- before we came up here, I told him

23 that he has a great judge today that is going to speak to him

24 and help him understand about whether he can file and where he

25 can file.

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

```
 1          THE COURT:  All right.  Thank you.

 2          Mr. Ramaswamy, what is the Government's position?

 3          MR. RAMASWAMY:  I will get to what the Government

 4  believes the punishment will be in a moment, but just on the

 5  pro se filing side, I noticed most recently the clerk's office

 6  seems to have captioned these "filed in a closed case."  But

 7  these -- it seems that Mr. Hill was released as part of his

 8  initial confinement in November, and these things didn't start

 9  at first until almost -- the more comfortable at home, the more

10  it appeared to him he shouldn't have any conditions.  It was an

11  escalation of filing, including the allegations against the

12  District Court, but also others, and it would seem

13  appropriate -- I know Ms. Pryor won't be representing him

14  forever, but there are things that were filed that contained

15  such private information, his medical records, for instance.

16  He's trying to litigate his case through the public filing

17  system, the ECF filing system.  If anyone else other than

18  himself were to file these things, I think there would be

19  sanctions involved.

20          But any filings during whatever period the Court

21  deems appropriate that he cares to file, if it's a method of

22  him dealing with his anxiety, should not be filed but should be

23  sent to Ms. Pryor.

24          THE COURT:  Well, I am going to have a discussion in

25  a moment.  I think the message is clear, but I will talk with
```

1  the Defendant about this.

2          My understanding is that she represents he's

3  withdrawing all of those now and that he gets it.  We'll see in

4  a moment.

5          **MR. RAMASWAMY:**  I am not looking to escalate this

6  particular violation any further, but I think beyond -- it's

7  not that it's de minimis, but the conduct with the probation

8  officer, there is something very concerning, and that is what's

9  on the telephone.  Now, that did not occur in the Middle

10 District, and there is no means for, for instance, grand jury

11 subpoena that the Government might have that examined, but I do

12 think the Court could order that phone examined because if it

13 found it useful, I understand that the --

14         **THE COURT:**  I think I heard Ms. Pryor say they

15 offered to have it -- did I hear you right on that?

16         **MS. PRYOR:**  Your Honor, my client wanted Ms. Burton

17 to -- Officer Burton to examine the phone.  I just believe that

18 they didn't have the resources at the time, but I'm assuming --

19 if you order it, I am going to assume that it can be done.

20         **THE COURT:**  Well, anything can be done by consent.

21         **MS. PRYOR:**  Okay.

22         **THE COURT:**  I believe.  There is no reason that --

23         **THE PROBATION OFFICER:**  Your Honor, there is a

24 condition in place if he is willing to do that.

25         **THE COURT:**  Okay.

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1          **THE PROBATION OFFICER:**  We can seek out the resources

2     to make that happen.

3          **THE COURT:**  So for purposes of proceeding, are you

4     saying that he is consenting to the examination of his phone?

5          **MS. PRYOR:**  Do you mind if I just quickly ask him?

6          **THE COURT:**  That will be fine.

7      (Ms. Pryor conferred with the Defendant.)

8          **THE COURT:**  I want to stop right here.  I am going to

9     ask you in a minute what your answer is.  Don't tell me right

10    now.  I want to go ahead and deal with the sentencing issue

11    first.  Then I will get to that issue because I don't want

12    anybody to think that I conditioned anything I did on whether

13    or not he is going to consent to something.  He's got a right

14    to decide what to do.

15         **MR. RAMASWAMY:**  Your Honor, ultimately, I guess --

16    it's recommended that he be sentenced to the high end.  I don't

17    know, based on all of that, that that's appropriate here.  It

18    is a complex matter, it was from the beginning, and it led to

19    an unusual agreement by the parties, but I would ask -- I

20    wouldn't ask for anything above the low end.  I know that would

21    be an additional maybe two months' incarceration, but I do

22    think based on the conduct related to Ms. Burton that that

23    would be appropriate, along with perhaps an admonition

24    regarding ECF filings.

25         **THE COURT:**  What about a residential reentry center?

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1  Has that ever been discussed?  Is that something that --

2          **MS. PRYOR:**  Your Honor, I saw that as one of the

3  recommendations.  The only issue that I have with the

4  residential reentry center is, Your Honor, they don't

5  specialize -- or none that I saw in my research specialize in

6  anything that deals with, not only his disability, but his

7  health issues.  The residential reentry center, based on my

8  research, is just almost like a, I guess, halfway house where,

9  you know, yes, he would have his independence, but there's

10 no -- it puts him back in a position where he can be exploited,

11 where he can be bullied, where he can be asked to do things

12 that he probably should not be doing, and I think it's just

13 because people would take advantage of him.  And that would be

14 my only reason I would not want him to be right back before you

15 because of somebody exploiting him.

16          So I would only suggest -- I would not be up to

17 recommending, but if that is the recommendation, of course,

18 from the Court, Your Honor, we understand.

19          **THE COURT:**  Okay.  Mr. Hill, is there anything you

20 would like to say on your own behalf before I make a decision?

21 Let me say something first, sir.  You don't have to say

22 anything, if you don't want to.  You have the right to remain

23 silent.  If you decide that you don't want to say anything, I

24 am not going to hold that against you; but if you do want to

25 say something, then this is the appropriate time before I make

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1 a decision, and I ask you to speak up so we can hear you, if

2 you do, sir.

3          **THE DEFENDANT:** May I be allowed to present myself as

4 a witness, Your Honor?

5          **MS. PRYOR:** Do you mind if I --

6          **THE COURT:** Why don't you have a conversation with

7 him.

8      (Ms. Pryor conferred with the Defendant.)

9          **MS. PRYOR:** Thank you, Your Honor.

10          **THE DEFENDANT:** I apologize to Ms. Kristy Burton and,

11 you know, I made sure to comply with the conditions of

12 supervised release on the same day I made sure to tell her that

13 I would schedule it that day with Kristen Patterson of Piedmont

14 Community Services, and I told her I wanted to mediate the

15 situation peacefully. I wanted to meet with her again so I

16 could mediate the situation. That way, you know, it doesn't

17 escalate, things don't get worse.

18          You know, I want to make sure I am complying with

19 supervised release, and the reason for the pro se motions was

20 not to be mean or nasty to the Court. All I just wanted to do

21 was prove my innocence, but that's for another matter, for a

22 matter that's going to be with Attorney Cynthia Everson,

23 Attorney-at-Law.

24          I do regret my behavior, and I am willing to get

25 counseling, but the current counselor wasn't really helping me.

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1  What I would like to ask the Court is that I be allowed to seek

2  new private counseling, to find someone who is willing to help

3  me and help with my behavior, and I want to be able to -- I

4  want to comply with the supervised release conditions.

5       And then once I overturn my conviction, that's what I

6  am planning to do, then I can be vacated from that sentence.

7  Until then, I promise under penalty of perjury that I will

8  comply with supervised release until the -- I mean, I will

9  comply.  And the 2255 motion, I don't know if it's going to

10 work or not, but I have a firm belief that it will succeed,

11 but, you know, as long as I am under supervised release, I

12 promise I will comply with supervised release, I promise.

13      **THE COURT:**  Now, you had several pro se motions you

14 filed in my court in this case, and Ms. Pryor says you now are

15 withdrawing those for purposes of this case.  Is that, in fact,

16 true?

17      **THE DEFENDANT:**  Yes, sir.

18      **THE COURT:**  All right.  Thank you.  Mr Cameron and

19 Ms. Burton, can I speak with you just a moment?

20     (Off-the-record discussion.)

21      Okay.  Here is what I am going to do.  I am not going

22 to revoke Mr. Hill right now.  He did violate the conditions of

23 his supervised release.  What I am going to do, though, is

24 modify his conditions, and I am doing this because he made

25 threatening conduct toward the probation officer.  He used

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

inappropriate verbal language toward the probation officer, as was indicated. He filed a number of documents that contained highly inappropriate material about a number of things, including the prior district judge, as well as some court officials.

I am considering his mental health and his age. I am going to modify the conditions to include the following:

The Defendant shall participate in a cognitive behavioral program as directed by the probation officer. The programs may include group sessions led by counselors or participation in a program administered by the probation office. Also, that he cooperatively participate in a mental health treatment program, which may include inpatient and residential treatment as directed by the probation officer.

Mr. Hill asked for some different counselor. I leave the decision of counselors to the probation office, but these are additional conditions.

Now, I am going to warn you, Mr. Hill -- and, Ms. Pryor, please tell him -- not to file anything further in the ECF filings that are pro se motions that are inappropriate. As long as you have a lawyer, you go through your lawyer. That's what your lawyer is for.

A number of the filings concern me because, as I have said, they have a somewhat near delusional approach to his whole situation, and I am concerned because that suggests that

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1 he thinks that he doesn't have to comply because he doesn't

2 think he's guilty.  He's already pled guilty.  The Court found

3 him guilty.  So as long as he is under this court order entered

4 by the district judge, he has to comply with all these

5 conditions.  Okay?

6       **MS. PRYOR:**  Yes, Your Honor.

7       **THE COURT:**  He can file whatever other legal papers

8 he wants to file as long as they are grounded in the law and

9 have a good-faith basis, et cetera; but as long as his judgment

10 in his criminal case stands, he has to comply with these

11 conditions.  If he does not, there will be consequences; and in

12 the future, depending on the violation, they frequently involve

13 going to prison.  Okay.

14       So please be very careful about that, Mr. Hill.

15       Now, are there any other conditions that I missed?

16       **THE PROBATION OFFICER:**  May I approach, Your Honor?

17       **THE COURT:**  Yes.  I wanted to add one other

18 condition, and that is, because of the nature of the violation,

19 and I think you invited it, a condition of home incarceration;

20 is that right, Ms. Pryor?

21       **MS. PRYOR:**  I did, Your Honor.

22       **THE COURT:**  I am going to amend the conditions of

23 supervised release to add home incarceration for six months.

24       **MS. PRYOR:**  Six months, Your Honor?

25       **THE COURT:**  Yes.

USA v. Brian Hill  —— SRV Hearing  —— 6/30/2015

1          **MS. PRYOR:**  Your Honor, if he's in compliance, is

2   there any way that I could petition the Court in between that

3   time to ask for an early release of home detention, or it is

4   the six months, Your Honor?

5          **THE COURT:**  It is for six months.

6          **MS. PRYOR:**  Okay.  Thank you, Your Honor.

7          **THE COURT:**  You can always ask, but it's unlikely to

8   be anything different.  I am doing that because of the nature

9   of the conduct.

10          **MS. PRYOR:**  I understand, Your Honor.

11          **THE COURT:**  So that will be GPS monitoring with home

12  incarceration for six months.

13          So I want Mr. Hill to understand the importance of

14  working with the probation officer.  I want the family to

15  understand the importance of him working with his officer to

16  make sure he is in compliance.

17          **MS. PRYOR:**  I understand that, Your Honor, and I will

18  explain it to him, Your Honor.

19          **THE COURT:**  Anything further that I need to address?

20          **THE PROBATION OFFICER:**  No, Your Honor.

21          **THE COURT:**  Okay.  All right.  Have you had an

22  opportunity, Ms. Pryor, to speak with him about any rights of

23  appeal that he has?

24          **MS. PRYOR:**  I did speak with him about appeal rights,

25  Your Honor.

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1          **THE COURT:**  Please make sure he is aware if he

2   chooses to file notice of appeal that he must do so in writing

3   within 14 days of the entry of the Court's judgment in this

4   case, and that if he cannot afford the cost of his appeal, he

5   can ask the Fourth Circuit to waive the cost of his appeal.

6          **MS. PRYOR:**  Yes, Your Honor.

7          **THE COURT:**  Anything further from the parties?

8          **MS. PRYOR:**  Nothing further from the defense, Your

9   Honor.

10         **MR. RAMASWAMY:**  No, Your Honor.

11         **THE COURT:**  All right.  Please work with the

12  probation office, members of the family.  It is an unusual

13  situation.  I understand Mr. Hill's issues with autism.  If you

14  have ways that will help probation, approach them.  I'm sure

15  they will be interested in knowing that.  On the other hand,

16  they have a job to do, and please do everything you can to help

17  the probation officer work with your son and grandson to make

18  sure that probation can do the job that they need to do.

19         Okay.  All right.  Thank you very much.  We'll be

20  adjourned for the day.

21     (END OF PROCEEDINGS AT 5:11 P.M.)

22

23                              * * * * * *

24

25

USA v. Brian Hill  -- SRV Hearing  -- 6/30/2015

1 UNITED STATES DISTRICT COURT

2 MIDDLE DISTRICT OF NORTH CAROLINA

3 CERTIFICATE OF REPORTER

4

5

6      I, Briana L. Nesbit, Official Court Reporter,

7 certify that the foregoing transcript is a true and correct

8 transcript of the proceedings in the above-entitled matter.

9

10      Dated this 21st day of August 2015.

11

12

13                         _____
                         Briana L. Nesbit, RPR

14                          Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25